UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KEITH E. GEORGE,                    )
                                    )
          Plaintiff,                )
                                    )
     v.                             )   Case No. 4:09CV1686 FRB
                                    )
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
          Defendant.                )


<u>**MEMORANDUM AND ORDER**</u>

          This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All matters are pending
before the undersigned United States Magistrate Judge, with consent
of the parties, pursuant to 28 U.S.C. § 636(c).

## I.    Procedural Background

          In September of 2008, plaintiff filed applications for
Disability Insurance Benefits ("DIB") and Supplemental Security
Income  ("SSI"),  alleging  disability  as  of  March  31,  2008.
(Administrative  Transcript  ("Tr.")  at  109-22).    Thereafter,
plaintiff amended his onset date several times.  (Tr. 8, 19-21,
108, 138, 191).  At the time of the April 14, 2009 hearing,
plaintiff amended his onset date to allege disability beginning
March 2, 2007.  (Tr. 8, 19-21, 138).  On April 21, 2009, plaintiff
again  amended  his  applications  to  allege  a  closed  period  of
disability from March, 2, 2007 to December 9, 2008.  (Tr. 108,
191).

Plaintiff's applications were initially denied, and he requested a hearing before an administrative law judge ("ALJ"). (Tr. 67). On April 14, 2009, a hearing was held before an ALJ, (Tr. 17-55), and on May 21, 2009, the ALJ issued his decision denying plaintiff's applications. (Tr. 5-15). Plaintiff sought review of the ALJ's decision with defendant Agency's Appeals Council, (Tr. 16), and on September 2, 2009, the Appeals Council denied plaintiff's request for review.[1] (Tr. 1-4). The ALJ's decision thus stands as the Commissioner's final decision. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Hearing Testimony</u>

During plaintiff's administrative hearing, the ALJ heard testimony from plaintiff and from Brenda Young, a vocational expert ("VE"). At the beginning of the hearing, counsel for plaintiff indicated that he wished to amend plaintiff's onset date to allege onset a year earlier, and to allege a continuing disability rather than a closed period of disability. (Tr. 19-21). Counsel explained that he was doing so because plaintiff was involved in a vocational rehabilitation program, and the Regulations allowed one to continue benefits until graduation. (Tr. 20-21). The exact provision was not correctly quoted.

Plaintiff testified that he had been referred for

---

[1]The Appeals Council indicated that it reviewed additional evidence; namely, a July 14, 2009 letter from attorney Frank A. Williams. (Tr. 4). Mr. Williams' letter is found in the record at pages 195-96.

vocational rehabilitation, and that this was the second time he had been referred. (Id.) He stated that he first used vocational rehabilitation in 2004 following back surgery, and was successful. (Id.) Plaintiff testified that his present vocational supervisor told him they could help him with schooling, or pay an employer to take him on and give him permanent employment. (Tr. 42). Plaintiff testified that he had not seen his vocational supervisor in two months, and was confused by her opinion, inasmuch as she told him he would not be hired for sedentary jobs he felt he could do. (Tr. 44). Plaintiff's counsel stated that plaintiff had applied for vocational rehabilitation, but the ALJ explained that he required proof that plaintiff was actively participating in a continuing vocational rehabilitation program. (Tr. 47-49). At counsel's request, the ALJ agreed to hold the record open for seven days following the hearing to allow presentation of such evidence. (Tr. 53).

Plaintiff testified that he was married, and lived in a house with his wife and their two children, ages 13 and 10. (Tr. 23). Plaintiff graduated from high school, and completed two years of trade school in floor installation. (Tr. 24). Plaintiff has a driver's license, but testified that a neighbor drove him to the hearing. (Id.) Plaintiff testified that he did not have a vehicle; that he had lost both of his vehicles the preceding month; and had just purchased a vehicle for his wife. (Tr. 25). He testified that he last drove about a month ago. (Id.)

Plaintiff testified that he last worked in April of 2008

at apparently two carpet installation positions; that each job lasted about four or five days; and that he earned just over $3,000.00. (Id.) He testified that he worked three jobs in December of 2007 that went into 2008. (Tr. 25-26). Upon questioning by the ALJ, plaintiff testified that he worked for Diamond Wall Midwest in 2006 doing various jobs, such as front desk supervisor, expediter for the fence company, router, scheduler, and finance supervisor. (Tr. 27). As finance supervisor, plaintiff supervised people, and did counter sales and estimates for customers. (Id.) Before this, plaintiff worked as a truck coordinator, which involved scheduling deliveries and drivers, and making sure the truck maintenance and paperwork was in order. (Tr. 27-28). As expediter, router, and scheduler, plaintiff was responsible for getting contracts and installation site surveys. (Tr. 28). Before this position, plaintiff was in training, learning the business. (Id.) Before working for Diamond Wall Midwest, plaintiff worked for five years for Flooring Systems Incorporated as a floorman, floor layer, and journeyman floorer. (Tr. 29). In the interim, plaintiff worked for Richard Floor Covering as a floorman. (Id.) In 1996, plaintiff worked as a floorman for KCI Construction and Trans Commercial Flooring, and in 1995, plaintiff worked as a floorman for Beseda Enterprises. (Id.)

Plaintiff testified that he began seeing Dr. Doerr in March of 2007 for shoulder pain. (Tr. 30). Plaintiff stated that his neck would tense up and pain would radiate down his right arm, and he would lose sensation in his hand "to the point of

-4-

overexertion like sweating, major headaches." (Id.) Plaintiff testified that he had on occasion vomited and blacked out after driving home. (Id.) Plaintiff testified that he had a partial tear in his rotator cuff, and that Dr. Doerr administered a cortisone shot. (Tr. 30-31). Plaintiff testified that the shot did not help, and he requested pain medication to allow him to get back to work. (Tr. 31). Plaintiff testified that, when he returned to Dr. Doerr, however, he again received a shot. (Id.) Plaintiff testified that Dr. Doerr told him to do therapy three times per week, "and then we'll talk about surgery." (Id.) Plaintiff testified that he replied that he "didn't have that time to spare," and proceeded to get a second opinion and to go to pain management. (Id.)

Plaintiff testified that, during pain management, he received a total of three cortisone injections in his neck, and was taking Vicodin.[2] (Tr. 32). He stated that the first injection lessened his pain, but the pain returned, and he requested and received a second injection. (Tr. 33). Plaintiff testified that the second injection helped for "not even a month," and that surgery was recommended, but cardiology clearance was needed. (Id.) Plaintiff explained that he had been diagnosed with cardiomyopathy, and takes daily medication. (Tr. 33-34). Plaintiff underwent cervical fusion on September 11, 2008, and then did physical therapy exercises at home. (Tr. 34). Plaintiff

---

[2]Vicodin is a combination of the drugs Acetaminophen and Hydrocodone, and is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

testified that he had radiating pain across his right shoulder blade into his neck, but has not received treatment due to lack of resources. (Tr. 35).

Plaintiff testified that, since he was diagnosed with cardiomyopathy, he has "not felt 100 percent on any given day." (Tr. 36). He stated that he has ongoing pain and headaches, and could not work overhead with his right arm. (<u>Id.</u>) He testified that he could carry a bag of groceries, but not very far, and estimated that he could comfortably lift 15 pounds but no more than 20. (<u>Id.</u>) Plaintiff stated that he was bedridden for a week after moving a bag of charcoal. (<u>Id.</u>) He testified that, in March of 2007, he was able to sit for two hours before experiencing pain in his back and right leg. (Tr. 38). When asked whether his neck would hurt, plaintiff testified "[w]ell, yeah. I mean it would droop down. It would cause just fatigue, a lot of fatigue and the arm heavy." (<u>Id.</u>) He stated that he had a hard time sitting in the right posture. (<u>Id.</u>) Plaintiff testified that, in March of 2007, he could stand for "maybe two hours" before needing to lie down, and stated that, at the time, he frequently laid down for fifteen minutes each hour, even when working. (Tr. 39).

When asked whether he had symptoms related to cardiomyopathy, plaintiff testified that the only symptoms he had were side effects from the drugs he took. (Tr. 40). He testified

that he took Coreg[3] and Accupril,[4] (Tr. 44), which caused profuse sweating, cold hands and feet, and fatigue. (Tr. 40). He stated that he had an echocardiogram once per year, and saw a specialist every six months. (Tr. 40-41). Plaintiff then testified that he had fluid in his lungs and had a hard time breathing, and that he gagged "quite a bit." (Tr. 41). Plaintiff testified that workers' compensation had not been involved with any of the problems he had had since March of 2007. (Tr. 45).

The ALJ then heard testimony from vocational expert Brenda Young. Ms. Young characterized plaintiff's past work as semiskilled, and medium and sometimes heavy from a lifting standpoint. (Tr. 50). The ALJ asked Ms. Young to assume a hypothetical individual who could lift and carry 20 pounds occasionally and ten pounds frequently; stand and/or walk for a total of up to about six hours in an eight-hour day with the normal breaks; sit for a total of up to about six hours in an eight-hour day with the normal breaks and engage in no more than occasional overhead use of the dominant arm; and who would need to avoid concentrated exposure to extremes of heat and cold. (Tr. 51). Ms. Young testified that such an individual would be able to work in plaintiff's past positions of counter sales and estimation, and truck coordinator. (Id.)

---

[3]Coreg, or Carvedilol, is used to treat heart failure (condition in which the heart cannot pump enough blood to all parts of the body) and high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697042.html

[4]Accupril, also known as Quinapril, is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692026.html

The ALJ then asked the VE to assume the factors from the first hypothetical with the additional factor of a limitation of two hours at a time for standing, sitting or walking, and the VE testified that such a limitation would not preclude those jobs. (Tr. 52).

Plaintiff's counsel asked the VE to assume that the individual would be required to lay down or recline for up to a total of two hours during the workday, and the VE testified that such restriction would preclude those jobs, and would also preclude all full-time work. (Tr. 52-53).

B.  Medical Records

The record indicates that plaintiff saw Dale E. Doerr, M.D., on March 2, 2007 with complaints of right shoulder and neck pain. (Tr. 203-04). Plaintiff denied a specific injury, but stated that he began having right shoulder and neck pain on March 1, 2007 after putting together a set of steps. (Tr. 203). Plaintiff stated that he had experienced right shoulder pain in the past, but that it had been intermittent. (Id.) Plaintiff stated that he had pain with forward flexion, abduction, and internal and external rotation, and described the pain as "sharp." (Id.) Plaintiff stated that Vicodin controlled his pain and helped him sleep. (Id.) Plaintiff stated he had occaional numbness and tingling radiating down the right upper extremity to his hand and fingers, but that his was intermittent and not attributable to his recent pain. (Tr. 203).

Dr. Doerr noted that plaintiff was alert and oriented, and in no apparent distress. (Tr. 204). Upon examination, Dr. Doerr noted full range of motion of the neck, with slight tenderness to palpation over the right lateral neck with lateral flexion to the left, and mild tenderness to the trapezius muscles. (Id.) There was no swelling, discoloration, bruising, or warmth to palpation. (Id.) There was decreased range of motion with forward flexion to 90 degrees, abduction to 90 degrees, and full internal and external rotation, and no instability was noted. (Id.) Strength was +5 out of 5, and there was no tenderness to palpation over the acromioclavicular joint. (Tr. 204). Dr. Doerr's impression was right shoulder impingement syndrome, right shoulder acromioclavicular degenerative joint disease, and right shoulder rotator cuff tear, and he ordered an MRI. (Id.)

An MRI performed on March 7, 2007 revealed prominent hypertrophic bone changes of the acromioclavicular joint, multiple small tears of the labrum with the early development of paralabral cysts, but no rotator cuff tear. (Tr. 205-06). Plaintiff returned to Dr. Doerr on March 9, 2007, and his MRI findings were noted. (Tr. 202). Dr. Doerr indicated that he discussed treatment options with plaintiff, and chose cortisone injection, which was then performed. (Id.) Plaintiff reported "good relief" of his pain following injection, and was scheduled to return in one month. (Id.)

Plaintiff returned to Dr. Doerr on April 4, 2007, and reported that he was starting to have more pain in the area of his

right shoulder. (Tr. 201). Physical examination revealed improved range of motion, but plaintiff was still tender on some of the extremes of motion. (Id.) Dr. Doerr advised that plaintiff return to activities as tolerated, and return for reevaluation in three to four weeks. (Id.)

Records from Edward M. Geltman, M.D., of the Cardiovascular Division of Washington University's School of Medicine, indicate that plaintiff was seen on April 12, 2007 for follow up regarding his nonischemic cardiomyopathy. (Tr. 242-43). Plaintiff reported being physically active; stated that he had lost his office job; and that he was working part-time doing flooring. (Tr. 242). Dr. Geltman noted that plaintiff's was 251 pounds, which was unchanged, and described plaintiff as "somewhat overweight." (Id.) Plaintiff did not feel any specific exercise limitation, but did not do anything "terribly vigorous" such as jog or play tennis. (Id.) Dr. Geltman noted that plaintiff was "doing really quite well from a cardiovascular standpoint," and that no changes in plaintiff's treatment were needed. (Id.) Dr. Geltman wrote that plaintiff was "having some difficulty with his right rotator cuff, but right now, there is no surgery planned. If it were to be done, I see no reason from a cardiovascular standpoint that would generate any excessive cardiac risk." (Tr. 242). Dr. Geltman noted that an echocardiogram would be performed when plaintiff's "insurance status stabilizes." (Id.)

Records from Gerald Mahon, M.D., indicate that plaintiff was seen on July 13, 2007 for evaluation of neck and right shoulder pain. (Tr. 226-28). Plaintiff stated that his problem had been going on for months, and described his symptoms as burning and aching pain that begins at the base of his right neck or in his upper back and radiated down his arm to his hand, and stated that he sometimes felt pain in his elbow. (Tr. 226). Plaintiff denied weakness and stated that he had been taking Tylenol for pain. (Id.) Plaintiff reported that chiropractic treatment and physical therapy had not helped. (Id.) Dr. Mahon noted that plaintiff had a history of idiopathic cardiomyopathy, atrial fibrillation and CHF, but that these conditions were under control. (Id.) Plaintiff reported that he was taking Deltasone[5] and Tessalon Perle.[6] (Tr. 226).

Musculoskeletal examination revealed 5/5 plus strength in plaintiff's upper extremities, (Tr. 227), and normal reflexes and sensation in both arms. (Tr. 228). Dr. Mahon's assessment was neck pain and arm numbness and cervical radiculopathy. An MRI was ordered, and plaintiff was given Vicodin and Flexeril.[7] (Id.)

---

[5]Deltasone, or Prednisone, is used alone or with other medications to treat the symptoms associated with low levels of corticosteroids, which are substances that are normally produced by the body and necessary for normal body functions. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html

[6]Tessalon Perles, or Benzonatate, is used to treat cough due to the common cold, bronchitis, pneumonia, or other lung infections. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682640.html

[7]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

Plaintiff's July 16, 2007 MRI revealed a large right sided lateral spur and disc combination affecting the dura and the exiting root, and minimal diffuse disc bulging at C4-5 and C6-7. (Tr. 229).

On August 7, 2007, plaintiff was seen by Robert J. Bernardi III, M.D. for neck pain that had caused him to limit his working. (Tr. 258). Plaintiff stated that overhead work aggravated his pain. (Id.) Upon examination, there were no muscle spasms, trigger points, or swelling, and plaintiff had full range of motion of his neck and shoulders. (Id.) Dr. Bernardi reviewed plaintiff's MRI and opined that plaintiff had right C6 radiculopathy, and was a candidate for selective right-sided C6 nerve root injection and a home cervical traction device. (Tr. 259).

Records from Malti Dave, M.D., of St. Louis Pain Management Center, Inc., indicate that plaintiff was seen on August 10, 2007 for evaluation of pain in his neck and right upper shoulder. (Tr. 210-11). Dr. Dave wrote that plaintiff reported having right shoulder discomfort since April of 2007, and that an MRI at that time revealed a "partial tear to right shoulder." (Tr. 210). Plaintiff reported undergoing a right shoulder injection, but suffering serious pain seven days later and seeing a chiropractor for an adjustment. (Id.) Plaintiff reported pain in his neck with radiation and numbness in his right arm; described his pain as "stabbing;" rated it as a five on a one-to-ten scale; and stated that it was worse in the evening. (Id.) He reported having had back surgery in 2004. (Id.) He reported that he took

-12-

hydrocodone[8] and cyclobenzaprine.[9]  (Tr. 210).  Upon examination, Dr. Dave noted that plaintiff was in no acute distress, with a normal gait and balance.  (Id.)  Plaintiff was given a right C6 selective nerve root injection.  (Tr. 212).

Plaintiff returned to Dr. Dave on September 10, 2007 and reported that the nerve root injection had given him two weeks of "good relief," but that his pain was slowly returning as he had "started working more."  (Tr. 212).  Plaintiff reported dull, aching, nagging pain on the right side of his neck.  (Id.)  he denied any new symptoms.  (Id.)  He denied past hospitalization.  (Id.)  It is indicated that plaintiff exercised, and worked as a floor layer.  (Tr. 212).

Upon examination, plaintiff had limited neck range of motion and a positive test for cervical radiculopathy.  (Id.)  He had full motor strength bilaterally, intact sensation, and a negative test for neurological tension.  (Id.)  There was no clubbing, edema or rash in his extremities.  (Id.)  Plaintiff was treated with a selective nerve root steroid injection.  (Tr. 212-13).

On January 30, 2008, plaintiff was seen by Bakul Dave, M.D., at Washington University's Division of Pain Management, with

---

[8]Hydrocodone is an opiate analgesic used to relieve moderate to severe pain.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html

[9]Cyclobenzaprine, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html

complaints of pain and numbness in the right side of his neck and shoulder area, which began in the spring of 2007 while bending and twisting at work. (Tr. 217, 218). Dr. Bakul Dave indicated that plaintiff had seen Dr. Malti Dave and had undergone nerve root injections "that helped him significantly." (Tr. 217). Plaintiff stated that his pain worsened with stress and exercise and improved with a cold pack. (Id.) He stated that he tried chiropractic treatment without much help. (Id.)

Plaintiff reported that he was taking Coreg, Accupril, Zoloft,[10] Vytorin,[11] and Atacand.[12] (Tr. 218). It was noted that plaintiff did not drink alcohol or smoke, but did use marijuana. (Tr. 217). Plaintiff reported that he did not feel depressed, and that he worked as a floor layer. (Id.)

Dr. Dave noted that plaintiff's power "was mostly 4+ to 5/5 in right hand grip; otherwise, 5/5." (Id.) Plaintiff had "mostly normal" sensation, decreased range of motion of flexion and extension of the cervical spine, and tenderness to the right cervical paraspinal area and right middle trapezius area. (Id.) Dr. Dave's assessment was cervical degenerative disc disease, and

---

[10]Zoloft, or Sertraline, is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html

[11]Vytorin, or Simvastatin, is used to reduce the amount of harmful fatty substances such as LDL cholestrol and triglycerides in the blood, and to increase the amount of HDL cholesterol in the blood.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030.html

[12]Atacand, or Candesartan, is used to treat hypertension.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601033.html

cervical radiculitis, and a nerve root injection was performed. (Tr. 217, 220-22). Dr. Dave advised plaintiff to follow up on an as-needed basis. (Tr. 217).

Plaintiff returned to Dr. Bernardi on June 4, 2008 and reported that he had undergone three selective nerve root injections with Drs. Malti Dave and Bakul Dave, and that he had had "definite improvement in his symptoms with the injection." (Tr. 261). Dr. Bernardi wrote that plaintiff stated that "after each injection his pain would be significantly better for one or two months and then would slowly recur." (Id.) Plaintiff reported that the pain he was currently experiencing was "not nearly as severe as the pain he was having before the injections." (Id.) Upon examination, Dr. Bernardi detected no muscle spasms, trigger points, or swelling, and plaintiff had full nontender range of motion of the shoulders, full motor power in his upper extremities, and normal tone. (Id.) Dr. Bernardi noted that plaintiff was a candidate for anterior cervical discectomy and fusion. (Tr. 261).

Plaintiff returned to Dr. Mahon on June 6, 2008 with complaints of swelling, warmth and tenderness over his right kneecap. (Tr. 225). Plaintiff reported that he knelt a lot in his job, and wore knee pads. (Id.) Dr. Mahon aspirated fluid from the knee. (Id.)

Plaintiff returned to Dr. Geltman on July 28, 2008, and was noted to have done reasonably well. (Tr. 240). Dr. Geltman described plaintiff as "overweight." (Id.) Plaintiff underwent an

-15-

echocardiogram, (Tr. 249-51), and Dr. Geltman wrote that, overall, he was "very pleased with [plaintiff's] cardiovascular condition." (Tr. 240).  Dr. Geltman wrote that he had emphasized the importance of achieving optimal body weight for long-term health.  (<u>Id.</u>)  Dr. Geltman noted that there was no cardiac reason precluding surgery. (<u>Id.</u>)

On September 11, 2008, Dr. Bernardi performed anterior C5-C6 discectomy and osteophytectomy and fusion at Barnes-Jewish West County Hospital.  (Tr. 263-67).  Plaintiff saw Dr. Bernardi for follow up on October 8, 2008, and Dr. Bernardi noted that plaintiff was "doing quite well," but had some residual symptoms which Dr. Bernardi opined were muscular in nature.  (Tr. 289). Plaintiff saw Dr. Bernardi again on December 9, 2008, and it was noted that radiographs of plaintiff's cervical spine were negative. (<u>Id.</u>)  Dr. Bernardi noted that plaintiff appeared to have had complete resolution of his pre-operative symptoms.  (Tr. 287).

On October 20, 2008, State agency medical consultant Mel Moore, M.D., completed a Physical Residual Functional Capacity Assessment.  (Tr. 272-76).  Dr. Moore opined that plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten; could stand and/or walk for about six hours in an eight-hour workday, and could push and/or pull without limitation. (Tr. 273).  Dr. Moore opined that plaintiff was limited in his ability to reach, but had no other areas of manipulative limitation.  (Tr. 274).  Dr. Moore opined that plaintiff should avoid concentrated exposure to extreme heat and cold.  (Tr. 275).

-16-

### III.    The ALJ's Decision

The ALJ in this case determined that plaintiff had not engaged in substantial gainful activity since March 2, 2007. (Tr. 10). The ALJ determined that plaintiff had the severe impairments of cervical degenerative disc disease, degenerative joint disease of the right shoulder, and cardiomyopathy, but did not have an impairment, or combination of impairments, that met or medically equaled a listed impairment. (Tr. 10, 12). The ALJ exhaustively analyzed all of the medical evidence of record, and concluded that plaintiff retained the residual functional capacity (also "RFC") to perform light work except that plaintiff was limited to only occasional overhead use of his right arm, and must avoid concentrated exposure to extreme heat and cold. (Tr. 10-12). In conjunction with his RFC determination, the ALJ analyzed the credibility of plaintiff's subjective complaints, citing 20 C.F.R. § 404.1529 and 416.929, the Regulations corresponding with the Eighth Circuit's decision in <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984), and concluded that plaintiff's subjective complaints of pain and other symptoms precluding all work were not entirely credible. (Tr. 12-14). The ALJ determined that plaintiff was capable of performing his past work as a counter sales person and truck coordinator/expediter, inasmuch as this work did not require the performance of work-related activities precluded by plaintiff's

residual functional capacity. (Tr. 14). The ALJ concluded that plaintiff had not been under a disability, as defined in the Social Security Act, from March 2, 2007 through the date of the decision. (Id.)

In the case at bar, plaintiff argues that the ALJ failed to conduct a proper credibility analysis. Plaintiff also challenges the ALJ's RFC determination, arguing that the ALJ failed to complete a function-by-function assessment and failed to include a narrative discussion of the rationale for his RFC finding. Plaintiff contends that the ALJ erroneously failed to properly consider his obesity and the numbness in his arm, hand and fingers when assessing his RFC, and argues that the ALJ failed to properly evaluate the opinion of the state agency medical consultant and explain the weight given thereto. Plaintiff further contends that the ALJ erroneously failed to make explicit findings of plaintiff's past relevant work, and failed to resolve the conflict between the VE's testimony and the requirements of plaintiff's past relevant work, inasmuch as the Dictionary of Occupational Titles ("DOT") descriptions that most closely resemble his past relevant work require frequent reaching, and the ALJ determined that plaintiff was limited in his ability to reach overhead. In response, the Commissioner contends that substantial evidence supports the ALJ's determination.

## IV. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's

impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, at the fifth step, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the

Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

6.   The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even when two inconsistent conclusions can be drawn from the evidence, the reviewing court may still find that the Commissioner's decision is supported by substantial evidence on the record as a whole.  Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  A reviewing court may not reverse the Commissioner's decision "merely because substantial evidence exists in the record that would have supported a contrary

outcome." <u>Pierce v. Apfel</u>, 173 F.3d 704, 706 (8th Cir. 1999) (citing <u>Smith v. Shalala</u>, 987 F.2d 1371, 1374 (8th Cir. 1993)).

A.    <u>Credibility Determination</u>

In determining the credibility of plaintiff's subjective complaints, the ALJ in this case cited 20 C.F.R. § 404.1529 and 416.929, the Regulations corresponding with the <u>Polaski</u> decision and credibility determination, and concluded that plaintiff's subjective complaints of pain and other symptoms precluding all work were not entirely credible.    (Tr. 12-14).    Plaintiff challenges this determination, arguing that the ALJ failed to conduct a proper analysis.    Review of the ALJ's credibility determination in light of the record reveals no error.

The Eighth Circuit has recognized that, due to the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect.    <u>Id.</u> at 1321-22.    In <u>Polaski</u>, the Eighth Circuit addressed this difficulty and set forth the following standard:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the

-22-

duration, frequency and intensity of the pain;
(3) precipitating and aggravating factors; (4)
dosage, effectiveness and side effects of
medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ may not accept or reject the claimant's
subjective complaints based solely upon personal observations or
upon the objective medical evidence, the ALJ may discount them if
there are inconsistencies in the evidence as a whole. Id. The
"crucial question" is not whether the claimant experiences
symptoms, but whether his credible subjective complaints prevent
him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th
Cir. 2003). The foregoing Polaski factors are to be considered in
addition to the objective medical evidence of record. See Baldwin
v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). "If an ALJ
explicitly discredits the claimant's testimony and gives good
reason for doing so, we will normally defer to the ALJ's
credibility determination." Juszczyk v. Astrue, 542 F.3d 626, 632
(8th Cir. 2008); see also Hogan v. Apfel, 239 F.3d 958, 962 (8th
Cir. 2001). The credibility of a claimant's subjective testimony
is primarily for the ALJ, not this Court, to decide, and this Court
considers with deference the ALJ's decision on the subject. Tellez
v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In the case at bar, the ALJ noted that the fact that
plaintiff had amended his onset date numerous times indicated
plaintiff's uncertainty as to when he was disabled. In addition,

the ALJ noted some discrepancy between plaintiff's testimony regarding the efficacy of his steroid injections and the evidence of record. Plaintiff alleges error, arguing that, consistent with his hearing testimony, plaintiff reported on September 10, 2007, that he had only two weeks of relief. While plaintiff correctly interprets the record, his argument does not defeat the ALJ's credibility determination. There is a contrast, however slight, between plaintiff's testimony that the injections caused his pain to "subside," that they "felt kind of good," and that his pain "came back" after he started working (Tr. 33) and his reports to Dr. Bernardi that "after each injection his pain would be significantly better for one or two months and then would slowly recur" (Tr. 261), and that the pain he was currently experiencing was "not nearly as severe as the pain he was having before the injections." (Id.) Moreover, even if it could be said that the ALJ erred in considering plaintiff's testimony inconsistent with the record, such error would be harmless. The ALJ observed the inconsistency as but one of several factors detracting from plaintiff's credibility, and there is no indication in the record that the ALJ assigned undue weight to this observation. There is no indication that the ALJ would have decided differently had he not considered plaintiff's testimony to contrast with his reports to his doctors. Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) (concluding that any error on the part of the ALJ was harmless because there was "no indication that the ALJ would have decided differently" in the absence of the error).

The ALJ noted that plaintiff's physical examinations often yielded normal findings in terms of range of motion, strength, reflexes, and sensation, and that plaintiff's doctors routinely noted the lack of swelling, muscle spasm, and trigger points. In addition, radiological studies performed following plaintiff's surgery failed to show abnormalities of any significance. While plaintiff correctly asserts that he sometimes exhibited abnormal findings on examination and that pre-operative radiological findings indicated disc bulge and bony overgrowth, the objective medical evidence, considered as a whole, simply does not support plaintiff's allegations of severe impairments that rendered him completely disabled from all work. See Juszczyk, 542 F.3d at 632 (deferring to the ALJ's credibility determination where the objective medical evidence did not support the claimant's testimony as to the depth and severity of his physical impairments). The undersigned recognizes that an ALJ may not discredit subjective complaints based solely on the lack of objective medical evidence. See Brosnahan v. Barnhart, 336 F.3d 671, 677-78 (8th Cir. 2003). However, an ALJ may, as in this case, consider the lack of such evidence as one credibility factor. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). Further support for the ALJ's decision is that plaintiff reported to Dr. Mahon in July of 2007 that he was taking only over-the-counter medication for pain. (Tr. 226). Over-the-counter medications are inconsistent with complaints of disabling pain. Loving v. Dep't. of Health & Human Serv., 16 F.3d 967, 971 (8th Cir. 1994); see also Rankin v.

Apfel, 195 F.3d 427, 430 (8th Cir. 1999) (the lack of strong prescription pain medication supports the ALJ's adverse credibility determination).

The ALJ also noted that, despite plaintiff's testimony that he stopped working in April of 2008, the record showed that he was still working at least as of June of 2008. Indeed, while plaintiff testified that he last worked in April of 2008, (Tr. 25), he told Dr. Bernardi on June 6, 2008 that he was having knee pain because he knelt a lot in his job. (Tr. 225). The ALJ was entitled to consider plaintiff's inconsistent statements as detracting from his credibility. Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001). Consistent with the ALJ's determination is the fact that plaintiff, in his Disability Report, reported that he was not working; that he had not worked at any time after the date his conditions first interfered with his ability to work; and that he had "stopped working due to [his] condition" on March 31, 2008. (Tr. 168). As noted above, the record indicates otherwise. Acts which are inconsistent with an allegation of disability may be considered as detracting from the claimant's credibility. Johnson, 240 F.3d at 1148-49. "Working generally demonstrates an ability to perform a substantial gainful activity." Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (citation omitted) (noting that the claimant's part-time work as a kitchen aide during the period she alleged she was disabled detracted from her credibility).

The ALJ also properly considered the fact that none of plaintiff's treating physicians placed any long-term limitations on

his abilities, or opined that he should not work at all. <u>Smith</u>, 987 F.2d at 1374 (the lack of significant medical restrictions is inconsistent with complaints of disabling pain). This is not reversible error, as plaintiff suggests, because the ALJ in this case conducted an independent and exhaustive analysis of the medical evidence of record. <u>See</u> <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995) (finding fact that reviewing physicians found no disability can be considered by ALJ so long as ALJ conducts independent analysis of medical evidence in the record).

Plaintiff also suggests that the ALJ ignored significant credibility factors of <u>Polaski</u>, and also suggests that the ALJ did not evaluate plaintiff's prior work records, his actual daily activities, precipitating or aggravating factors, and the dosage, effectiveness and side effects of medications. (Plaintiff's Brief, Docket No. 17, at pages 12-13). However, as noted above, the ALJ in this case specifically cited the Regulations corresponding with <u>Polaski</u> and credibility determination, and wrote that he had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" in accordance with that analytical framework. (Tr. 12). Furthermore, as noted above, the ALJ specifically noted several inconsistencies in the record that detracted from plaintiff's credibility. Plaintiff seems to assert that the ALJ was under an obligation to list each credibility factor and the evidence from the record pertaining thereto in something akin to bullet-point format. For this Court to require

the ALJ to do so would be unreasonable, and contrary to Eighth Circuit precedent.  See Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered"); Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (same); Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (An ALJ need not discuss every Polaski factor, but must take each one into account).

Despite plaintiff's arguments, this does not appear to be a case in which the ALJ relied too heavily on any one factor in discrediting plaintiff's subjective complaints.  Instead, it is apparent that the ALJ in this case thoroughly reviewed all of the evidence of record, explicitly considered the evidence of record in accordance with the required analytical framework, observed several inconsistencies in the evidence as a whole, and gave good reasons for discrediting plaintiff's complaints.  Having reviewed the record and having carefully considered all of plaintiff's allegations, the undersigned concludes that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.  See Hogan, 239 F.3d at 962 (Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, that decision should be upheld); see also Tellez, 403 F.3d at 957 (The credibility determination is primarily for the Commissioner, and not the courts, to make).

B.  RFC Determination

Plaintiff next challenges the ALJ's RFC determination, arguing that the ALJ: failed to complete a "function by function assessment and to include a narrative discussion of the rationale for the RFC finding," (Plaintiff's Brief, Docket No. 17, at page 9); failed to assess plaintiff's numbness and obesity; and failed to properly weigh Dr. Moore's opinion and offer a rationale for the weight given.  Review of the record reveals no error.

Residual functional capacity is what a claimant can still do despite his limitations.  20 C.F.R. § 404.1545, Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  A disability claimant has the burden of establishing his RFC.  See Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004).  The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer, 245 F.3d at 704.  The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  20 C.F.R. §§ 404.1545(a), 416.945(a); Anderson, 51 F.3d at 779; Goff, 421 F.3d at 793.  Although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).

In the case at bar, the ALJ incorporated into his RFC determination those impairments and restrictions he determined to be credible following his legally sufficient determination of plaintiff's credibility. See McGeorge v. Barnart, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluation of the entire record.") The ALJ summarized in great detail the medical and non-medical evidence, including plaintiff's treatment records demonstrating mostly normal physical examinations, efficacy of steroid injections, his significant improvement following surgery, and the fact that his cardiac condition had nearly normalized. Plaintiff contends that the ALJ's RFC determination is deficient because he failed to provide a narrative statement linking the RFC to the evidence of record, and failed to complete a "function-by-function" assessment, as required by Social Security Ruling 96-8p. Review of the record reveals no error.

As plaintiff notes, the RFC should "identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including functions such as sitting, standing, and walking. Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003) (quoting S.S.R. 96-8p, 1996 WL 374184, at *1). In Depover, the Eighth Circuit noted that an ALJ's failure to make the function by function assessment "could result in the adjudicator overlooking some of an individual's limitations or restrictions." Id. The

<u>Depover</u> Court noted that, in <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 568-69 (8th Cir. 1999), the ALJ's decision was reversed on this basis because the ALJ had failed to "specify the details" of the claimant's RFC, and instead described it "only in general terms," leaving it unclear whether substantial evidence supported the ALJ's decision that the claimant could return to his past relevant work. <u>Id.</u>

In the case at bar, however, (as in <u>Depover</u>) the ALJ did not merely describe plaintiff's RFC in "general terms." <u>See Id.</u> Instead, as noted above, the ALJ conducted a detailed analysis of all of the objective evidence of record, and of plaintiff's testimony, and formulated a specific RFC that took into account all of plaintiff's limitations that the ALJ found credible and supported by the record. It is apparent that the ALJ's determination was made following a full examination of the record, and it does not appear that the ALJ overlooked any limitations. While the ALJ did not present his RFC findings in bullet-point format with each limitation immediately followed by a discussion of the supporting evidence, such a rigid format is not required by Social Security Ruling 96-8p, as plaintiff seems to suggest.

Plaintiff argues that the ALJ erred in weighing the opinion of Dr. Moore, the State agency medical consultant, and failed to specifically state the weight assigned thereto. Review of the record reveals no error. An ALJ is entitled to consider RFC forms completed by a reviewing physician when determining a claimant's claim of disability. <u>See</u> 20 C.F.R. §§ 404.1527(f)(2);

416.927(f)(2); <u>Casey v. Astrue</u>, 503 F.3d 687, 694 (8th Cir. 2007) (finding that the ALJ properly considered the State agency medical consultant's opinion along with the medical evidence as a whole). In the case at bar, the ALJ considered Dr. Moore's opinion following his consideration of all of the other evidence of record, (Tr. 14), and determined that plaintiff retained the residual functional capacity to perform light work with exceptions as indicated, <u>supra</u>. Plaintiff argues that the ALJ failed to "examine the consistency and supportability" of Dr. Moore's opinion, inasmuch as Dr. Moore determined there were no manipulative limitations despite contrary evidence in the record. (Plaintiff's Brief, Docket No. 21 at page 5). Plaintiff also contends that Dr. Moore did not provide sufficient supporting explanation for his RFC assessment, and that it did not pertain to the onset period plaintiff ultimately alleged after numerous amendments. As stated above, however, the ALJ analyzed in detail all of the medical and non-medical evidence of record in determining plaintiff's RFC, evidence that pertained to all of the periods of disability plaintiff alleged throughout his case, and based his RFC determination on the evidence in the record as a whole.

It is obvious, following a reading of the ALJ's decision, that he based his decision on the record as a whole, and did not place undue weight upon Dr. Moore's opinion. Plaintiff's argument that the ALJ adopted Dr. Moore's opinion "in toto" is without merit. (Plaintiff's Brief, Docket No. 21 at page 7). As noted above, Dr. Moore indeed opined that plaintiff was "limited" in his

ability to reach in "all directions." (Tr. 274). The ALJ restricted plaintiff more specifically than what Dr. Moore's report indicated, and based such restrictions upon his evaluation of the evidence in the record as a whole. The ALJ acted within his authority in considering Dr. Moore's opinion along with the evidence in the record as a whole. Plaintiff's argument is without merit.

The ALJ observed that plaintiff reported having suffered from right shoulder pain since high school; had nonetheless worked with that impairment over a number of years; and had failed to demonstrate significant deterioration. As the ALJ noted, a condition that was present but not disabling during working years cannot be used to prove a present disability, absent evidence of significant deterioration. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (per curiam). Plaintiff alleges error, stating that his condition was degenerative and had significantly deteriorated. However, as discussed above, the ALJ determined that plaintiff had failed to so demonstrate, and substantial evidence supports his credibility and RFC determinations. See Pearsall, 274 F.3d 1211, 1217 (It is the claimant's burden, not the Commissioner's burden, to prove his RFC). The fact that the record may contain some evidence supporting the conclusion that plaintiff's shoulder condition deteriorated to a sufficient extent does not mandate reversal. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may also support a different outcome.

<u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003)

(citing <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001)).

Plaintiff contends that the ALJ failed to assess his obesity, and his allegations of numbness in his arm, hand, and fingers when assessing his RFC.  Review of the record reveals no error.  While obesity can impose a significant work-related limitation, substantial evidence supports the ALJ's refusal to include it in plaintiff's RFC.  None of plaintiff's treating physicians diagnosed plaintiff with obesity; they merely opined that plaintiff was overweight.  None of plaintiff's treating physicians ever imposed any work-related or functional restrictions on plaintiff due to his weight.  On April 12, 2007, Dr. Geltman described plaintiff as "somewhat overweight." (Tr. 242).  On July 28, 2008, Dr. Geltman noted that plaintiff had gained weight, and described him as overweight.  (Tr. 240).  In addition, while Dr. Geltman wrote that he had reminded plaintiff of the importance of achieving optimal body weight for long-term health, Dr. Geltman did not opine that plaintiff's weight posed a serious threat or that plaintiff should limit his activities because of his weight, despite his obvious attention to the matter and his opportunity to do so.  In fact, Dr. Geltman noted that he was very pleased with plaintiff's cardiac condition. (<u>Id.</u>)  In addition, plaintiff did not allege that his weight prevented him from working.  The fact that Dr. Moore described plaintiff as obese does not require reversal, inasmuch as the ALJ was required to consider all of the evidence of record in formulating plaintiff's RFC.  <u>See</u> <u>McNamara v.</u>

Astrue, 590 F.3d 607, 611 (8th Cir. 2010) (citing Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004)) (ALJ's decision supported by the lack physician-imposed functional restrictions due to obesity).

Plaintiff also contends that the ALJ failed to consider numbness in his arm, hand, and fingers. However, plaintiff told Dr. Doerr in March of 2007 that these symptoms had occurred intermittently over the past several years. As stated above, conditions that are present but not disabling during working years cannot be used to prove a present disability, absent evidence of significant deterioration. Orrick, 966 F.2d at 370. Plaintiff also fails to recognize that the ALJ's RFC determination was influenced by his determination that plaintiff's allegations were not fully credible, and this Court defers to that determination. See Tellez, 403 F.3d at 957 (citing Hogan, 239 F.3d at 962) (deference to ALJ is appropriate when he explicitly discredits claimant and gives good reasons for doing so).

Plaintiff also suggests, without being specific, that the ALJ failed to include non-exertional limitations in his hypothetical questions to the VE. "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) (citing Prosch, 201 F.3d 1010, 1015 (8th Cir. 2000)). As discussed above, substantial evidence supports the ALJ's RFC and credibility determinations, and the evidence of record fails to

document that numbness or obesity imposed any significant restrictions on plaintiff's functional abilities.  In addition, as noted above, the ALJ indeed included a limitation on plaintiff's ability to reach overhead, which he determined was supported by the record.  Likewise, the ALJ's hypothetical questions included all of the impairments he found to be credible.  It was permissible for the ALJ to exclude "any alleged impairments that [he] has properly rejected as untrue or unsubstantiated."  Hunt, 250 F.3d at 625 (citing Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997)); see also Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir.1994) (ALJ's failure to make specific reference to headaches in hypothetical to VE was not error because there was no medical evidence that condition imposed any restrictions on claimant's functional abilities).

Plaintiff also contends that the ALJ failed to resolve an apparent conflict between evidence provided by the vocational expert and information contained in the Dictionary of Occupational Titles (also "DOT") and its companion publication, the Selected Characteristics of Occupations (also "SCO").  This argument has merit.  Before an ALJ can rely on VE testimony to support a disability determination, the ALJ must identify and obtain a reasonable explanation for any conflict between evidence provided by the VE and information contained in the DOT.  See Jones v. Astrue, 619 F.3d 963, 977-978 (8th Cir. 2010) (citation omitted) (according to SSA policy, the adjudicator has an affirmative responsibility to ask about any possible conflict between the VE's

testimony and the information provided in the DOT, and to obtain an explanation for any such conflict.) In the case at bar, the VE testified that plaintiff could perform his past work as an "expediter" and a counter sales person, or counter clerk. The VE did not identify, and the ALJ did not solicit, the specific DOT numbers corresponding with these jobs, but as plaintiff notes, the DOT's two classifications of "expediter," including one at the sedentary level, involve "frequent" reaching. DOT 221.367-042 and DOT 222.367-018. As plaintiff further notes, the DOT also describes a "counter clerk" position as requiring "frequent" reaching. DOT 279.357-062.[13] As defendant notes, the SCO defines "reaching" as "[e]xtending hand(s) and arm(s) in any direction." Segovia v. Astrue, 226 Fed. Appx. 801, 804 (10th Cir. 2007) (unpublished). After listening to the VE's testimony, the ALJ asked: "[a]nd is the testimony you've given consistent with The Dictionary of Occupational Titles and The Selected Characteristics of Occupations?" (Tr. 52). To that question, the VE replied "[y]es sir." (Id.) The ALJ made no further attempt to identify and/or resolve any conflicts with respect to reaching, and no such testimony was offered. It is not apparent that either the ALJ or

---

[13]Before making his finding that plaintiff could return to his past relevant work, the ALJ noted that medical consultants with the State disability determination service determined that plaintiff could perform the jobs of mail clerk (DOT 209.687-026) ("frequent" reaching); furniture rental consultant (DOT 295.357-018)("occasional" reaching); and laundry worker, domestic (DOT 302.685-010) ("constant" reaching). While the furniture rental consultant position required only "occasional" reaching, the ALJ did not specify that he was determining that plaintiff could perform this work; only that the State agency medical consultants had determined he could. In addition, defendant does not argue that the ALJ's decision is supported by substantial evidence on the record as a whole based on this observation.

the VE were even aware of any conflict.

The similarities between the case at bar and the case of Chrastil v. Astrue, 2009 WL 3241784 (D. Neb. 2009) are striking. In Chrastil, the plaintiff successfully argued that remand was required because the ALJ failed to resolve a conflict between the VE's testimony and the DOT, given that the ALJ had determined that plaintiff could not reach overhead, and the jobs the VE identified required "frequent" reaching. In the case at bar, defendant's response to plaintiff's argument is that plaintiff is taking the role of VE in analyzing whether the DOT was consistent with the RFC, and that, because overhead reaching is not separately classified, even a job requiring frequent reaching does not necessarily require more than occasional overhead reaching. The defendant in Chrastil made a nearly identical argument, which was rejected by the Court. See Id. at *3. The undersigned rejects it as well because it is speculative and completely unsupported by the record. Although the ALJ determined, and the VE was aware, that plaintiff was limited in his ability to reach overhead, the VE did not offer, nor did the ALJ solicit, testimony to resolve the conflict between the ALJ's imposition of a restriction of no more than occasional overhead reaching and the DOT's provision that the specific jobs required "frequent" reaching.

The undersigned recognizes that, because the VE did not specify the DOT classifications she was referring to, it may very well be that she was referring to jobs different from the ones noted herein. However, because the record has left the undersigned

to speculate regarding this fact, the undersigned cannot confidently determine that the ALJ's decision to rely on the VE's testimony that plaintiff could return to his past relevant work as an "expediter" and a counter sales person, or counter clerk is supported by substantial evidence on the record as a whole.

Therefore, based upon the current state of the record on this particular issue, the ALJ's finding that plaintiff could return to his past relevant work as an "expediter" and a counter sales person, or counter clerk, is not supported by substantial evidence on the record as a whole, and remand is required to allow development of the record on this issue.

Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is reversed, and this cause is remanded to the Commissioner for further proceedings in accordance with this Memorandum and Order.

_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of March, 2011.